UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **BRIDAL EXPO, INC., H TEXAS MEDIA, INC., and QUALITY PUBLISHING SERVICES, INC.,** | § § § § § | |
| **Plaintiffs,** | § § | |
| v. | § § | **CIVIL ACTION NO. 4:08-cv-03777** |
| **SONJA VAN FLORESTEIN, TIFFANY MOORE, MARC MCINTOSH, THE WEDDING SHOWCASE, LLC, and SHOWCASE PRODUCTIONS, INC.,** | § § § § § § | |
| **Defendants.** | § § | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiffs' Request for a Preliminary Injunction (Doc. No. 1), and a Motion to Dismiss submitted by Defendant The Wedding Showcase, LLC ("Wedding Showcase"). (Doc. No. 9.) Considering all the parties' respective submissions, the testimony and evidence submitted at the limited evidentiary hearing, the transcript and evidence from the state court proceeding, and the applicable law, the injunctive request must be denied. Defendant's Motion will be granted in part and the remainder addressed in a further Order.

## I. INTRODUCTION

This case involves a bridal exposition and its new competitor in Houston. Plaintiff Bridal Expo Inc. ("Bridal Expo") produces the Bridal Extravaganza Show semi-annually in Houston. It is one of the largest bridal shows in the United States, with hundreds of

1

exhibitors and thousands of prospective brides in attendance, and has been in business for twenty-five years. At the shows, vendors set up booths where they sell gowns, flower arrangements, photography, catering, and other bridal services. Bridal Expo maintains databases of its attendees and potential clients in databases divided into bride and vendor files.

A new, competing show, the Houston Wedding Showcase, run by Defendant Wedding Showcase is scheduled to begin in February 2009 only a few weeks after the Bridal Extravaganza Show, at the same location, the George R. Brown Convention Center. Defendants Sonja van Florestein and Tiffany Moore were instrumental in creating Wedding Showcase and are former employees of Bridal Expo. Van Florestein was employed as the manager of the Bridal Extravaganza Show and Moore was her assistant. Both Defendants left Bridal Expo on July 30, 2008.

At about 4:30 p.m. on their last day of work, Laurette Veres, their boss, took van Florestein and Moore's office keys. (State Tr. vol. I, at 45; Veres Aff., Ex. 1 ¶ 9.)[1] At around 6 or 7 p.m. that day, Veres returned to work after a meeting and found van Florestein and Moore using a Bridal Expo office computer. (Tr. vol. I, at 45; vol. II, at 114.) Veres asked the two how they had entered without using their keys, and they replied they used another employee's keys. (Tr. vol. I, at 47-48.) They claimed they had more work to do before leaving, and van Florestein claimed she was sending a farewell e-mail to Bridal Expo employees and vendors. (Tr. vol. I, at 47.)

Eventually, after Veres became aware of the existence of Houston Wedding Showcase, Moore admitted that she downloaded Bridal Expo's databases on her last day

---

[1] All references to State Ct. Tr. or Tr. refer to the Temporary Injunction Hearing held December 22 and 23, 2008, in the District Court of Harris County, 55th Judicial District, Cause No. 2008-68106, the underlying state case.

of employment. A forensic analyst confirmed that many Bridal Expo files were copied from Moore's computer that day, including the Bridal Extravaganza vendor database (Sealed Doc. No. 2, Ex. A), brides list (Sealed Ex. B), July 2008 payment spreadsheet (Sealed Exs. C, D), the 2008 Bridal Extravaganza Show inventory list (Sealed Ex. F), other forms, and a vendor e-mail list (Sealed Ex. E), although some e-mails and one copy of a document were deleted, and it was difficult to determine if other files were copied or deleted. (Jan. 15, 2009, Mtn. Hr'g; State Tr. vol. I, at 198-202.) The forensic analyst charged over $13,000 for his services. Van Florestein and Moore subsequently lost their copies of the Plaintiffs' brides list, payment database, and inventory list. (Jan. 15, 2009, Mtn. Hr'g; Def. Resp. to Pls. Supp. Mem. at 3, Doc. No. 16.)

Moore testified that she has no memory of ever signing or receiving an employee handbook, a non-compete or a nondisclosure contract with any of the companies Veres owns.[2] (Tr. vol. II, at 215-16.) Van Florestein acknowledged that she received an employee policies and procedure manual from Quality Publishing Services, Inc. ("QPS"). (Tr. vol. I, at 184-85.) This handbook contained provisions describing the confidential nature of QPS-related material. (Tr. vol. I, at 185; Doc. No. 1, Ex. N.) Veres admitted that the copied documents and files at issue belong to Bridal Expo rather than QPS. (State Ct. Tr. vol. II, at 147-48.)

Moore leased a P.O. box for the Wedding Showcase in August 2008. Also that month, van Florestein and Moore filed a certificate of formation for Wedding Showcase. Several weeks later, Veres discovered that Bridal Expo e-mails were still being delivered to van Florestein's old desktop computer, and van Florestein admitted she had access to

---

[2] Veres is the secretary of Bridal Expo, owner of the Bridal Extravaganza Show, as well as the president and owner of H Texas Media, Inc. and Quality Publishing Services, Inc. Veres' employees commonly work for more than one company.

her e-mail after she resigned. Van Florestein also admitted she had the capacity to receive Bridal Expo phone calls for weeks after she resigned because she had forgotten to turn off the call-forwarding feature on her Bridal Expo direct line, although she testified that she only received one or two calls. Defendants admitted that they used the Bridal Expo's database to mail advertisements to vendors of their new company's November 2008 seminar. Defendants began promoting the Houston Wedding Showcase via Google advertisement as "Houston's #1 Bridal Show." (Doc. No. 1, Ex. M.) They also mailed a brochure to vendors that contained quotations, attributed to "our" vendors and "our" brides, that originated from vendors and brides at other bridal shows on the East Coast, produced by another company. (Tr. vol. II, at 60; Def. State Ct. Ex. 3.)

The final Defendant, Marc McIntosh, is the president and owner of Showcase Productions, Inc. that produces Bridal Showcase in Virginia. He allegedly loaned Wedding Showcase $15,000 for operations and has an oral agreement with van Florestein to become a 25 percent owner of the company and its chief marketing officer. (State Tr. vol. I, at 51; vol. II, at 45.)

In a previous state court proceeding, Plaintiffs brought claims for misappropriation of trade secrets, unfair competition, conversion, breach of fiduciary duty, and civil conspiracy. A state court judge denied Plaintiffs' request for a TRO and, after an evidentiary hearing on December 22 and 23, 2008, denied a temporary injunction. In late December 2008, Plaintiffs non-suited the state case, and brought this suit in federal court. Plaintiffs assert the same claims as in the underlying state case and add two federal claims, a Lanham Act claim for deceptive advertising, and a Computer Fraud and Abuse Act ("CFAA") claim. Plaintiffs pray for injunctive relief under the

Lanham Act and CFAA claims, and damages for the misappropriation, conversion, and breach of fiduciary duty claims, as well as attorneys' fees and costs. Specifically, Plaintiffs ask that:

> (a) Defendants be enjoined from using or disclosing Plaintiffs' vendor database, brides list, payment spreadsheet, inventory lists, vendor e-mail lists, vendor applications, contact lists, consumer lists, production files, internal records, or any other computer files or hard copies of same that Defendants may have obtained from Plaintiffs or gained through use of Plaintiffs' property or personnel.

> (b) Defendants return Plaintiffs documents or other property. Further they ask for an injunction to prevent Defendants from removing files from their computers in a way that would impair the ability of future computer or forensic analysts from performing their work.

> (c) Defendants be enjoined from making statements that they are producing the #1 Bridal Show in Houston or including in their advertisements statements from vendors purporting to have taken part in previous bridal shows put on by Wedding Showcase.

> (d) Defendants be enjoined from conducting business with persons and businesses identified in Plaintiffs' allegedly stolen files.[3]

(Pls. Supplemental Mem. at 19, Doc. No. 15.)

This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

## II.   PRECLUSIVE EFFECT OF THE STATE HEARING

Defendant Wedding Showcase argues[4] that the Court should not disturb the preliminary injunction determination made at the state court level for reasons of estoppel. Plaintiffs respond that estoppel is not applicable in this case.[5]

---

[3] At the limited evidentiary hearing held on January 16, 2009, prior to their Supplemental Memorandum (filed January 20, 2009), the Plaintiffs limited their request for injunctive relief. The Court now finds that preliminary injunctive relief is not warranted, and therefore the Court need not address the scope of relief requested.

[4] All of the briefing in this case so far was submitted by Defendant Wedding Showcase. Consequently, when referring to arguments made on behalf of the Defendants, the Court will use the singular verb tense.

[5] Plaintiffs argue that FED. R. CIV. P. 8(c) requires estoppel to be affirmatively pled, otherwise it is waived. Defendants van Florestein, Moore, McIntosh, and Showcase Productions, Inc. have not yet answered and have therefore not asserted collateral estoppel or res judicata. In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense including estoppel and res judicata. FED. R. CIV. P. 8(c). As construed by the Fifth Circuit, Rule 8(c) prevents a defendant from "ambushing" a plaintiff with an

Plaintiffs did not allege newly discovered facts for the state claims. In addition to the claims alleged in state court, Plaintiffs allege two federal causes of action under the Lanham Act and the Computer Fraud and Abuse Act ("CFAA") that purportedly were established based on evidence not discovered until the state temporary injunction hearing. The Court held a Preliminary Injunction Motion hearing on January 15, 2009, to allow parties to present additional testimony and evidence regarding Plaintiffs' federal claims.

As to the state claims, the Court finds that the state court's temporary injunction holding should not be disturbed. A federal court looks to state law rules when determining the preclusive effect of a state court judgment. *Matter of Garner*, 56 F.3d 677, 679 (5th Cir. 1995). "Under Texas law, collateral estoppel 'bars relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit, regardless of whether the second suit is based upon the same cause of action.'" *Id.* at 681 (citing *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex. 1984).). In *Bonniwell*, the Texas Supreme Court further explained:

> A party seeking to invoke the doctrine of collateral estoppel must establish (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.

663 S.W. 2d at 818.

"For collateral estoppel purposes, 'full and fair litigation' means actual litigation in the previous suit of the same fact issues." 48 TEX. JUR. 3D JUDGMENTS § 516; *see also McDonald v. Houston Brokerage, Inc.*; 928 S.W.2d 633, 637 (Tex. App.—Corpus Christi

---

unexpected defense to which it has insufficient time to respond. *See, e.g., Rogers v. McDorman*, 521 F.3d 381, 385-86 (5th Cir. 2008). Since both parties have addressed the Court on the issue of estoppel as well as filed numerous briefs discussing it, the Court does not find that 8(c) requires it to hold that individual Defendants van Florestein, Moore, McIntosh and Showcase Productions, Inc. have waived this defense.

1996) (citing *Puga v. Donna Fruit Co.*, 634 S.W.2d 677, 678 (Tex. 1982)). Where the underlying state action involves a temporary restraining order hearing, Texas law does not require that this hearing have a preclusive effect on later evidentiary hearings bearing on other types of relief. *State of Texas v. Wellington Resources Corp.*, 706 F.2d 533, 536-37 (5th Cir. 1983). Similarly, preliminary injunctions only have preclusive effect on later decisions on the merits when the injunction decision is "necessarily based upon a determination that constitutes an insuperable obstacle to the plaintiff's success on the merits." *Abbott Labs v. Andrx Pharmaceuticals, Inc.*, 473 F.3d 1196, 1206 (Fed. Cir. 2007) (holding that a determination that there was a likelihood of proving invalidity of a patent was not full litigation or a decision on the merits).

Other federal courts have found that a decision regarding a preliminary injunction, however, based on the same factual and legal underpinnings, may have a preclusive effect on a subsequent request for a preliminary injunction. *See Hayes v. Ridge*, 946 F.Supp.354, 364 (E.D. Pa. 1996) (applying Pennsylvania law of collateral estoppel that forbids a party from litigating an issue a second time where there has been  a full and fair opportunity to litigate on the merits and reasoning that there was a final judgment on the merits of the limited issue presented by the preliminary injunction); *Lyon Ford Inc. v. Ford Marketing Corp.*, 337 F.Supp. 691, 695 (E.D.N.Y. 1971) (applying the New York law of collateral estoppel that forbids a party from litigating an issue a second time where there has been a full and fair opportunity to contest the matter). In contrast, when new evidence has come to light and the subsequent hearing involves a different analysis, an earlier preliminary injunction hearing cannot have a preclusive effect on a subsequent one. *See Hawksbill Sea Turtle v. Federal Emergency Management Agency*, 126 F.3d 461

(3d Cir. 1997) (holding that the first preliminary injunction hearing had no preclusive effect on the one at issue because evidence had recently come to light that the endangered species were in the area and that the construction project would last much longer than anticipated during the first hearing).

Here, the Court held a limited evidentiary hearing on the new federal claims and will discuss below the applicability of injunctive relief to those claims. The Court reviewed the state court transcript that covered a two-day evidentiary hearing including wide-ranging testimony addressing the claims in question. Neither side has suggested that it was not allowed to present all relevant evidence for the state claims such that the state claims were not fully and fairly litigated for the purposes of a temporary injunction. The facts were essential to the state court's determination that a temporary injunction based on Plaintiffs' state claims should be denied. In the state court action, the parties were cast as adversaries.

The Texas standard for collateral estoppel and that of New York and Pennsylvania are similar, such that the holdings of federal courts in those jurisdictions are persuasive authority suggesting that a prior injunction determination may preclude relitigation of a subsequent injunction determination.[6] In addition, in the few cases in which federal courts found that prior injunctive relief determinations had a preclusive effect on subsequent injunctive relief, little time had passed since the state court decided the plaintiffs' preliminary injunction. Here, just over a month has elapsed since the state

---

[6] Likewise, the Texas temporary injunction standard relies on two of the same elements necessary to find a federal preliminary injunction. To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The state court judge denied the Plaintiffs' request for a temporary injunction from the bench and did not explain which element Plaintiffs had failed to prove, but failure to prove any of them would be fatal to Plaintiffs' request for a federal injunction. (State Tr. Vol. III, at 6.)

court denied Plaintiffs' request for a temporary injunction. Since that time, Plaintiffs testified that they held a successful bridal show, suggesting that, to the extent the state court considered the effect on Plaintiffs' show in its preliminary injunction determination, this evidence now weighs against granting injunctive relief. The Court does not sit as an appeals court over state court judgments and respects the principles of comity. The Court will not disturb the state court's discretionary balancing of the temporary injunction factors. A preliminary injunction as to Plaintiffs' state court claims shall be denied.

## III. PRELIMINARY INJUNCTION AS TO PLAINTIFFS' FEDERAL CLAIMS

### A. Standard

"A preliminary injunction requires that 'the applicant ... show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.'" *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (quoting *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003)). Although the grant or denial of a preliminary injunction rests in the discretion of the trial court, *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940), "[w]e have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Lake Charles Diesel*, 328 F.3d at 196 (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 2003)).

### B. Analysis

### 1. Likelihood of Success on the Merits

### a. Lanham Act claim

To assert a claim for false advertising under § 43(a) of the Lanham Act, the plaintiff must prove that the defendant "use[d] in commerce any … false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities … services, or commercial activities ..."  15 U.S.C. § 1125(a). A prima facie case under § 43(a) requires the plaintiff to establish: (1) the defendant made a false statement of fact about its product; (2) the statements deceived or had the capacity to deceive a substantial segment of potential customers; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its products to enter interstate commerce, and (5) the plaintiff has been or is likely to be injured as a result. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000); *Taquino v. Teledyne Monarch Rubber* 893 F.2d 1488, 1500 (5th Cir. 1990).

Plaintiffs claim that the Google advertisement asserting that Houston Wedding Showcase is "Houston's #1 Bridal Show" is literally false. Plaintiffs claim that Bridal Extravaganza is, in fact, the largest bridal show in Houston, measuring this claim by any number of factors. In addition, Plaintiffs assert that the statements in Defendants' brochures for vendors are literally false, partially based on admissions from van Florestein and McIntosh at the state hearing, and also because Defendants have not yet produced a bridal show in Houston. Plaintiffs also contend that the statements are not puffery because they are unambiguous and need no additional context to give them meaning.

Defendant Wedding Showcase argues that Plaintiffs' Lanham Act claim fails because the statements on which Plaintiffs base their claim are not actionable misstatements of fact, have no capacity to deceive prospective customers, and have no reasonable likelihood of impacting a prospective customer's purchasing decision. It contends that the Google advertisement is puffery and that the statements in the brochures from "our" brides or vendors are not false because "our" refers to the principals of Wedding Showcase, who have produced many shows. Wedding Showcase further contends that the statements have no tendency to mislead because the brochure mentions several times that the Houston Wedding Showcase is a new show.

In order to satisfy element one of a Lanham Act claim, the plaintiff must prove that the commercial message is either literally false or, if not literally false, has the tendency to deceive consumers. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,* 290 F.3d 578, 586 (3d Cir. 2002). The statement must be viewed in the overall context in which it appears. *Pizza Hut, Inc.*, 227 F.3d at 495 n.5. If the plaintiff proves the statement is literally false, there is no need to show that the buying public was misled. *Johnson & Johnson-Merck Consumer v. Rhone-Poulenc Rorer Pharm., Inc.,* 19 F.3d 125, 129-30 (3d Cir.1994). If the statement is not literally false, the plaintiff needs to provide some evidence that the statement is likely to mislead and confuse consumers. *Pizza Hut v. Papa John's*, 227 F.3d 489, 497 (5th Cir. 2000); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1390 (5th Cir. 1996).

In addition, in order to be actionable, a statement must be more than a bald assertion of superiority or a general statement of opinion. *See Pizza Hut*, 227 F.3d at 495-96; *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 685 (5th Cir.

1986). The Fifth Circuit describes non-actionable puffery as occurring in at least one of two forms: (1) "an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying; or (2) a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion." *Pizza Hut*, 227 F.3d at 497-98 (holding that by themselves the statement "Better Pizza" is non-actionable puffery under the first category, and "Better Ingredients" is puffery under the second category, but in the context of ads depicting sauce and dough, both are misleading statements of fact). In order to be a statement of fact, a statement must be the type that can be adjudged as true or false and admits of empirical verification. *Presidio*, 784 F.2d at 679; *see also Southwest Recreational Industries, Inc. v. Fieldturf, Inc.*, No. 01-50073, 2002 WL 32783971, *4 (5th Cir. Aug. 13, 2002).

If the statement is shown to be misleading or ambiguous, the plaintiff must demonstrate actual deception through direct evidence of customer reaction to the advertising or evidence of consumer surveys or consumer reaction tests. *See, e.g., IQ Products Co. v. Pennzoil Products Co.*, 305 F.3d 368, 375 (5th Cir. 2002). If applying for injunctive relief, the movant must prove that the ads "have a tendency to deceive consumers." *Pizza Hut*, at 497. This requires proof that at least some consumers were confused. *Id.* at 498; *See also IQ Products Co.*, 305 F.3d at 376.

In order to prevail on a Lanham Act claim, the plaintiff must also provide evidence that plaintiff has been or is likely to be injured as a result of the statements. *See, e.g., Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1500 (5th Cir. 1990); *Southwest Recreational Industries, Inc. v. Fieldturf, Inc.*, No. 01-50073, 2002 WL

32783971, at **4-5 (5th Cir. Aug. 13, 2002) (not designated for publication) (holding that evidence of injury was sufficient where executives testified that they had personal knowledge that they had lost between fifteen and thirty prospective accounts because of defendants' false statements).

### i. Google Ad

Based on the holding in *Pizza Hut*, the Court finds Defendants' statement that the Wedding Showcase is "Houston's #1 Bridal Show" too ambiguous to be actionable. *See, e.g.*, *In re Century 21-RE/MAX Real Estate Advertising Claims Litigation*, 882 F.Supp. 915, 923 (C.D.Cal. 1994) (holding that the phrases "largest volume" and "#1" when used in a letter to clients are too vague to be actionable and the phrase that the company has been "declared ... #1 in the United States and the World" is puffery, because it is an opinion and makes no reference to the category in which the company is number one). It is not clear with respect to what metric Defendants claim to be number one, forcing the Court to conclude that this statement is not empirically verifiable. Consequently, Defendants' statement cannot be considered literally false. Furthermore, this statement falls neatly into the category of "bald assertion of superiority or a general statement of superiority" that the *Pizza Hut* court described as puffery. At this stage of the litigation, Plaintiffs have not provided evidence sufficient for the Court to conclude that it is likely to succeed on the merits of this claim. Furthermore, Defendants have taken down this ad, suggesting that injunctive relief, as to this statement, would be unnecessary.

### ii. Vendor Brochure

Plaintiffs claim that Defendants' vendor brochure contains actionable statements because it contains quotations from vendors that are described as "our" vendors, even

13

though Defendants have not yet held their show. In addition, Defendants have admitted that all of the quotations are from vendors at other shows on the East Coast. Likewise, the brochure contains statements from brides who participated in East Coast bridal shows and the brochure attributes the statements to "our" brides. Plaintiffs contend that the statement in the brochure that van Florestein and McIntosh have a combined 25 years of experience is literally false. Plaintiffs further argue that, by scheduling their show shortly after Defendants' show at the same location, Defendants are attempting to confuse and mislead their customers into believing that their show is also the Bridal Extravaganza Show.

The Court cannot conclude, at this juncture, that the statements in the brochures are literally false. The attribution "our" could plausibly be, and in context, likely is, to the show's owners, McIntosh and van Florestein. McIntosh ran the shows on the East Coast that are the source of the quotations. Likewise, the statement "the management team has more than 25 years of combined experience" apparently refers to the sum of the two principals', van Florestein and McIntosh, individual experience in the field. (Jan. 15, 2009, Mtn. Hr'g, Def. Ex. 3, Vendor Brochure at 4, 6.) The statements do not rise to the level of literal falsity.

When read in context, the statements in the vendor brochure make it clear that the quotations from "our" brides and "our" vendors could not come from brides and vendors who previously attended the new Houston Wedding Showcase. The vendor brochure explains that Houston Wedding Showcase is "a new show... with a long history" and explains that "your bridal show options are about to change." (Vendor Brochure at 4.) Consequently, the Plaintiffs must proffer some evidence that the brochures have a

tendency to deceive consumers. It is difficult for the Court to conclude that sophisticated audiences such as vendors, who have familiarity with the Houston wedding market, would be misled by the brochure into thinking that the Houston Wedding Showcase had existed long enough to have quotations from former vendors and brides, or that "our" brides or vendors referred to those who had previously attended the show in Houston.

At the Motion hearing on January 15, 2009, Veres testified that she had heard from one vendor at the Bridal Extravaganza Show that he was confused about who was running the Houston Wedding Showcase's February 2009 show. Veres admitted that the vendor did not claim confusion based on the ad or the brochure. This evidence is insufficient to allow the Court to conclude that relevant customers are confused. The deceptive nature of an advertisement is the kind of question best suited for a jury, and therefore, the Court certainly makes no final resolution concerning an ultimate determination on the merits, but at this stage, without sufficient evidence of the likelihood of deception, the Court cannot conclude that Plaintiffs' chance on the merits of their Lanham Act claim is sufficient to warrant injunctive relief.

### b. CFAA claim

Plaintiffs assert claims based on 18 U.S.C. § 1030(a)(4) that establishes a violation for a person who, "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C.A. § 1030(a)(4) (2008). (Pls. Supplemental Mem. at 15, Doc. No. 15.) "Any person who suffers damage or loss

by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C.A. § 1030(g). "The scope of the injunctive relief is dictated by the extent of the violation established." *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1159 (5th Cir. 2006) (internal citations omitted). The Third Circuit has divided the § 1030(a)(4) claim into four elements: "(1) defendant has accessed a 'protected computer;' (2) has done so without authorization or by exceeding such authorization as was granted; (3) has done so 'knowingly' and with 'intent to defraud'; and (4) as a result has 'further[ed] the intended fraud and obtain[ed] anything of value.'" *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC,* 428 F.3d 504, 508 (3d Cir.2005).

In order to establish a civil violation of the CFAA, a plaintiff must also allege facts sufficient to establish one of the factors set forth under former § (a)(5)(b). 18 U.S.C. § 1030(g). The only factor applicable to Plaintiffs' claims is "loss to 1 or more persons during any 1-year period … aggregating at least $5,000 in value." 18 U.S.C. § 1030(a)(5)(B)(i) (2008).[7] The term "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C.A. § 1030(e)(11). This definition was added in 2001.

Plaintiffs claim that Defendants van Florestein and Moore knowingly, and with intent to defraud and misappropriate confidential trade secrets, exceeded their authorized access to Plaintiffs' computers and obtained information after having given notice of their

---

[7] The statute was amended in 2008, but Defendants' conduct occurred prior to the effective date of the amendment.

resignation. Plaintiffs allege that Defendants were provided employment manuals explaining that information related to customers was to be kept confidential, returned upon resignation, and not to be removed from the office. Plaintiffs allege that Defendants accessed, deleted, copied, took and stole Plaintiffs' confidential business and proprietary information without authorization and caused a loss of over $5,000. Specifically, Plaintiffs claim that, "prior to resigning, Defendants van Florestein and Moore copied the Plaintiffs' client lists and databases, which have been developed and maintained over twenty-five years." (Doc. No. 4, Pl. Mem. in Support of Application for a TRO and Request for Preliminary and Permanent Injunction, at 5.)

Defendant Wedding Showcase argues that the CFAA claim fails because Plaintiffs cannot establish that Defendants accessed their computer files without authorization or in a manner that exceed their authorization. It further contends that the conduct on which Plaintiffs predicate their CFAA claim does not involve interstate or foreign communication, Plaintiffs have suffered no actionable loss or damage compensable under the CFAA, and the conduct on which Plaintiffs predicate their CFAA claim occurred before Defendant Wedding Showcase existed.

### i. Without authorization or exceeding such authorization

Plaintiffs contend that van Florestein and Moore acted without authorization because they accessed the files on the day of their resignation after they returned their keys. Wedding Showcase responds that because van Florestein and Moore accessed their work computers and files to which they were allowed access as employees, they did not exceed their authorized access. Wedding Showcase responds that van Florestein and Moore acted pursuant to their authorized access: they took computer files to which they

had been granted access as employees, while they were still employed. Veres admits that the Defendants had access to Bridal Expo's databases as part of their responsibilities at Bridal Expo, and Veres was aware of their use of Bridal Expo computers on their last day. Wedding Showcase argues that there is a difference between one's access to the computers and the use or disclosure of the information obtained through one's access.

Under the CFAA, the term "exceeds authorized access" means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C.A. § 1030(e)(6). The term "authorization" is undefined. Courts are split over the meaning of the terms "without authorization" or "exceeds authorized access." Some courts conclude that authorization may be used to reach an employee's conduct when she accesses files and uses them to harm the employer even if she technically has the authorization to access the files in the scope of her duties as an employee. *Compare, e.g.*, *Shamrock Foods Co. v. Gast*, 535 F.Supp.2d 962 (D. Ariz 2008); *Lockheed Martin Corp. v. L-3 Communications Corp.*, 6:05-cv-1480-ORL-31, 2006 WL 2683058 (M.D. Fla. Aug. 1, 2006) (unpublished) (holding, under (a)(4), that the plain meaning of "without authorization" or "exceeding authorized access," the employee did not copy information from the computer "without authorization" even though the employee later used it for improper purposes);[8] *with Int'l Airport Ctrs. LLC v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006) (holding that, under § 1030(a)(5)(A)(i), authorized access to company computer terminated when employee

---

[8] *See also*, *Black & Decker (US), Inc. v. Smith*, 568 F.Supp.2d 929, 936 (W.D. Tenn. 2008); *International Assoc. of Machinists and Aerospace Workers v. Werner-Masuda, et al.*, 390 F.Supp.2d 479, 498-99 (D. Md. 2005) (holding that even when an employee breached a specific agreement with the employer not to use the information for purposes adverse to the employer, the employee did not access the information without authorization or in excess of her authorization).

acted in violation of his employment contract and contrary to the duty of loyalty that agency law imposes on an employee).[9]

The *Lockheed* court noted that, in other circumstances, when Congress wanted to prohibit actions other than access, such as "communication" and "delivery," it listed them. *See, e.g.*, 18 U.S.C. § 1030(a)(1) (prohibiting unauthorized access, or access exceeding authorization, of computers and obtaining and using information protected for reasons of national defense or foreign relations and similar conduct); *Lockheed*, 2006 WL 2683058, at *5. Furthermore, the *Lockheed* court argues that to allow (a)(4) to stand for the proposition that anyone who accesses information with the intent to use the information in an adverse manner to her employer is acting "without authorization" or "exceeding authorized access" reads the limiting phrases describing authorization out of the statute. *Lockheed*, 2006 WL 2683058, at *6. The *Lockheed* court contends that, if Congress wanted to reach all wrongdoers who access information that they will use to the detriment of their employers, it could have omitted the limiting words on authorization altogether.

---

[9] *See also, EF Cultural Travel BV v Explorica, Inc.*, 274 F.3d 577, 583-84 (1st Cir. 2001) (relying on the definition of "exceeds authorized access" to conclude that employee acted outside the scope of his confidentiality agreement by providing proprietary information to another tour company employee to allow him to glean information from the former employer's public website); *Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F.Supp.2d 1188, 1196-97 (E.D.Wash. 2003) (holding that CFAA enabled a former employer to maintain action to prevent former employee from using wrongfully acquired trade secret information in order to compete against former employer). In a criminal case discussing other sections of the CFAA, the Fifth Circuit cites with approval, but does not rely upon, the *Citrin/Explorica* line of cases for the proposition that "courts have recognized that authorized access typically arises only out of a contractual or agency relationship." *U.S. v. Phillips*, 477 F.3d 215, 221 (5th Cir. 2007) (upholding a conviction under 5(A)(ii) and (B)(i)). In *Phillips*, the defendant was convicted for stealing private information from a university's database by setting up a program that randomly plugged in social security numbers to its log-in screen until one matched the database. The *Phillips* court discusses and then applies the "intended use" analysis set forth in *U.S. v. Morris*, 928 F.2d 504 (2d. Cir. 1991) that evaluates whether access to computer system is authorized based on whether the access is within the "expected norms of intended use" or within the "nature of the relationship established between the computer owner and the user." *Phillips*, 477 F.3d at 219-20 (citing *Morris*). In so doing, the Fifth Circuit does not explicitly hold that either line of cases is appropriate. Consequently, the Court will evaluate the different lines of persuasive authority in making its determination on the issue, keeping in mind the "intended use" analysis.

The Court acknowledges that other circuits have approved the use of the CFAA to reach employees who have obtained information in violation of their confidentiality agreements and have extended this reasoning to breaches of the duty of loyalty to employers. *See, e.g., Citrin; ViChip Corp. v. Lee*, 438 F.Supp.2d 1087 (N.D.Cal. 2006). The Fifth Circuit has not yet taken a position on the issue, but given the persuasive arguments in *Lockheed*, and the rule of lenity, given that the CFAA is also a criminal statute, the Court declines to read the CFAA to equate "authorization" with a duty of loyalty to an employer such that the CFAA is applicable to this case.

Here, the files at issue were copied or downloaded on van Florestein and Moore's last day of employment. They had signed no confidentiality agreement with Bridal Expo or any other agreement restricting their access to the files they had been working with at their jobs at Bridal Expo. It was within the nature of their relationship with Veres that they could use their computers and access the files at issue. In addition, Veres saw them using the computer on their final day and did not complain about their access. In light of these facts, the Court cannot conclude that Plaintiffs are likely to succeed on their CFAA claim, because van Florestein and Moore did not act in excess of their authorization. It will, therefore, not reach other arguments relating to other elements of the claim.

### ii. Remedies

Furthermore, even had the Court found that Plaintiffs were likely to succeed on the merits of their CFAA claim, it could not conclude that preliminary injunctive relief is warranted. The *Roehrs* Court held that, where the jury found that defendants did not steal trade secrets through actions that violated § (a)(4), injunctive relief was improper. *Roehrs*, 470 F.3d at 1159. In addition, it left open the question of whether injunctive

relief was appropriate for information obtained through a past violation of the CFAA. *Id*. The Court finds that the Fifth Circuit's hesitancy to afford injunctive relief based on a similar fact pattern, combined with the reasoning of other courts, establishes that an injunction is not warranted in this case.

The cases in which courts have afforded plaintiff's injunctive relief involved the potential for ongoing access of a plaintiff's computer systems. *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 937 (9th Cir. 2004); *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 580, 585 (1st Cir. 2001) (upholding an injunction barring defendants from using the "scraper program" and requiring the return of all information generated through the scraper); *Register.com, Inc. v. Verio, Inc.*,126 F.Supp.2d 238, 252 (S.D.N.Y. 2000) (enjoining parties because there was a risk that future use of defendants' software robot could cause the computer system to malfunction or crash); *Maxpower Corp. v. Abraham*, 557 F.Supp.2d 955, 956-963 (W.D.Wis. 2008) (explaining that any injunction that might be entered against defendants would depend on whether plaintiffs could prove that defendants continue to access computers or use the information they improperly obtained).

Here, Plaintiffs have not proffered evidence that Defendants intend to continue to access Plaintiffs' computers or continue to use any of the information they improperly stole from Plaintiffs. Furthermore, Veres testified that she had not yet found anything deleted or otherwise unavailable that was necessary for the business operations of Bridal Expo. (Jan. 15, 2009, Mtn. Hr'g.) Defendants contend, and Plaintiffs do not dispute, that the brides list and other information taken was subsequently lost.  Defendants concede that Plaintiffs' vendor e-mail list was used to advertise the November 2008 seminar.

Defendants, however, have provided no reason for the Court to believe that they will continue to use the vendor e-mail list. If this is a mistaken belief, the Court would be willing to reconsider its decision regarding a preliminary injunction. Based on the evidence, and testimony proffered thus far, the Court cannot conclude that the Plaintiffs have a substantial likelihood of success on the merits. Because Plaintiffs have not met their burden of persuasion with respect to the likelihood of success on the merits, the Court need not reach the other elements of the preliminary injunction test.[10]

## IV. DEFENDANT'S MOTION TO DISMISS

Furthermore, Defendant's Motion to Dismiss as to Plaintiffs' CFAA claim will be granted. Another Order will address Defendant's contentions as to the Lanham Act and the Court's exercise of supplemental jurisdiction.

## V. CONCLUSION

Plaintiffs' request for a preliminary injunction (Doc. No. 1) is **DENIED**. Defendant's Motion to Dismiss is **GRANTED** as to Plaintiffs' CFAA claim, which is hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

SIGNED this 3rd day of February, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[10] Even if the Court had found that Plaintiffs were likely to succeed on the merits of their claims, it would not have afforded injunctive relief in this case. Plaintiffs have not met their burden to establish irreparable harm, especially in light of a successful bridal show even after Defendants entered the market. Moreover, Defendants would suffer great harm if they were enjoined from producing their bridal show—they would have to cancel contracts, unwind arrangements on short notice, and pay cancellation fees for reservations already made.